IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

ORION DOUGLAS MEMMOTT,

        Defendant.

_____/

NO. CR-S-08-402 KJM

<u>FINDINGS OF FACT AND</u>

<u>CONCLUSIONS OF LAW</u>

1

# TABLE OF CONTENTS

I.   The Superseding Indictment and Summary of Trial . . . . . . . . . . . . . . . . . . . . . . . . .   4

II.  Findings of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

    A.  Mr. Memmott's Personal and Professional Background . . . . . . . . . . . . . . . .   7

        1.  Education and Family . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . .   7

        2.  Business Ventures (1985 - Present) . . . . . . . . . . . . . . .. . . . . . . . . .   8

        3.  Day Trading . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . 10

        4.  Real Estate Purchases, Sales and Investments (1995-2002). . . . . . . . 12

            a.  S. Culver Property . . . . . . . . . . . . . . . . . . .. . . . . . . . . 12

            b.  Washington Street Property . . . . . . . . . . . . . . . .. . . . . . 14

            c.  Rice Ranch Partners . . . . . . . . . . . . . . . . . . . . . . . . . . 18

            d.  Jefferson Street . . . . . . .. . . . . . . . . . . . . . . .. . . . . . . 19

            e.  W. Sycamore Street . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        5.  Other Information on Financial Condition . . . . . .. . . . . . . . . . . 21

    B.  IRS Audit and Assessments (1996-2002) . . . . . . . . . . . . . . .. . . . . . . . . 22

    C.  Audit Results and Tax Court Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    D.  IRS Tax Collection Efforts (2005-2006) . . . . . . . .. . . . . . . . . . . 25

III. Analysis and Conclusions of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . 26

    A.  Count One . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . 26

        1.  Mr. Memmott made and signed a tax collection document . . . . . . . . . 26

        2.  Mr. Memmott knew the Form 433-A contained materially false
           information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . 27

            a.  Washington Street Property . . . . . . . . . . . . . . . . . . . . . . 27

            b.  Diverted Investor Funds . . . . . . . . . . . . . . . . . . . . . . . . 30

        3.  The Form 433-A contained a written declaration subject to
           penalties of perjury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

2

          4.       In filing the Form 433-A, Mr. Memmott acted willfully . . . . . . . . . . . 33

B.      Count Two . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . 34

          1.       Mr. Memmott owed more tax for 1993-1999 than he
                declared due . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . 34

          2.       Mr. Memmott knew more tax was owed than was
                declared due . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . 34

          3.       Mr. Memmott made an affirmative attempt to evade or
                defeat such tax . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . 36

          4.       In attempting to evade or defeat, Mr. Memmott
                acted willfully . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . 38

IV.    Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . 39

The government's case against Orion Douglas Memmott came on for bench trial from October 22 through October 30, 2012. Michael Anderson and Kevin Khasigian represented the government. Bruce Locke represented Mr. Memmott. At the conclusion of trial, Mr. Locke requested that the court prepare findings of fact as provided by Federal Rule of Criminal Procedure 23(c). Following trial, the parties presented a set of stipulated facts, as well as their separate proposed factual findings, all of which the court has carefully reviewed in light of the record established at trial and the court's observation of witnesses at trial. The court's findings and its conclusions of law follow; they were presented to the parties in open court on August 21, 2013. *See* FED. R. CRIM. P. 43(a). For the reasons set forth here, the court enters a judgment of conviction on both counts charged in the Superseding Indictment.

I.      The Superseding Indictment and Summary of Trial

The original Indictment against Mr. Memmott was filed on September 3, 2008. It contained two charges, Count One for violation of 26 U.S.C. § 7206(1), Subscribing to a False Tax Document, and Count Two for violation of 26 U.S.C. § 7201, Attempted Evasion of Payment of Tax. The Superseding Indictment against Mr. Memmott, filed on November 4, 2010, contained the same two charges, with different factual information charged in connection with Count One.

The elements of Count One as charged are: (1) Mr. Memmott made and signed a tax collection document, Form 433-A, on June 9, 2005, regarding collectability of individual taxes for years 1993-1999, which he knew contained false and incorrect information as to a material matter; (2) the document contained a written declaration that it was being signed subject to the penalties of perjury; and (3) in filing the false tax document, Mr. Memmott acted willfully. The particular allegations of Count One are that the Form 433-A contained false information in that it reported that Mr. Memmott did not own any real property; he did not have any personal checking or other bank accounts; and his gross monthly income was only $1,129.

/////

The elements of Count Two as charged are: (1) Mr. Memmott owed more federal income tax for the calendar years 1993-1999 than was declared due on his individual income tax return for those calendar years; (2) Mr. Memmott knew that more federal income tax was owed than was declared due on his tax return; (3) Mr. Memmott made an affirmative attempt to evade or defeat such additional tax; and (4) in attempting to evade or defeat such additional tax, Mr. Memmott acted willfully. The allegations contained in Count Two are that from on or about January 25, 1995 through August 23, 2006, Mr. Memmott willfully attempted to evade and defeat the payment of his individual income tax for the tax years 1993 through 1999, by concealing and attempting to conceal from the IRS the nature and extent of his income, accounts, and assets, as well as their location; by placing real property in the names of nominees; and by falsely understating his income, accounts, and assets.

The government argues it has proven Mr. Memmott's guilt beyond a reasonable doubt. With respect to Count One, it points to the evidence presented at trial of the following: (1) Mr. Memmott owned property, specifically 1024 Washington Street, Willows, California, in the name of a nominee; (2) that Mr. Memmott held several bank accounts in nominee corporate names that he used to transact his personal financial affairs and that he had an additional undisclosed bank account in his own name; and (3) that Mr. Memmott had significant undisclosed income from funds he diverted from investors. With respect to Count Two, the government points to evidence it says shows that Mr. Memmott had been aware of IRS efforts to place liens on his property since the mid to late 1990s, and that he controlled at least three properties through nominee names; that he earned unreported income from the sale of one of the properties, and earned substantial income through fraud; and that he concealed his spending and income through the use of bank accounts held by him in entity names. Mr. Memmott also allegedly made a series of false statements about his financial situation to the IRS in meetings with agents, on tax returns and on other IRS documents.

/////

Mr. Memmott takes the position that the government's own evidence proves, beyond a reasonable doubt, that Mr. Memmott is not guilty of the crimes charged. He also argues that the government has not met its burden of proving either Count One or Count Two. In particular, he contends he did not misrepresent information on the Form 433-A because he believed in good faith that he owned no real estate, that he had no bank accounts attributable to him personally and that any investor money he spent on himself was not income but a liability. He points to the fact that an IRS Agent filled in some portions of the 433-A form and then asked Mr. Memmott to initial some of those portions. He also argues that the government's theory as to "nominee" business accounts serving purely as surrogates for Mr. Memmott's personal financial affairs is legally flawed and in any event unsupported by the evidence elicited at trial. While Mr. Memmott concedes he embezzled funds from investors, he says those funds were not therefore "his" or "income" and available to pay the IRS. Additionally, he notes that after a six-year IRS audit beginning in 1996 to examine the characterization of capital losses of a partnership Mr. Memmott had with his son and brother, he contested the auditor's findings and ultimately settled with the IRS in 2004, for tax years 1993 to 1996, and in 2006, for tax years 1997 to 1999, because he could not afford to keep litigating. Essentially, Mr. Memmott argues he was flat broke from 2003 on, had a judgment for $60,000-$70,000 pending against him, lived only on money he stole from friends and drew off of credit cards, with no income or assets from which he could have paid taxes.

II.    Findings of Fact

In making its findings below, the court addresses primarily those facts that are disputed and relevant to determining whether the government has proven each element of its case beyond a reasonable doubt. Initially, the court addresses Mr. Memmott's personal and professional background, his business and real estate ventures, and the extended IRS audit of Mr. Memmott's tax returns between 1996 and 2002, as well as his subsequent challenge of the audit conclusions and the IRS's collection efforts leading to this action. Following these findings, the court

6

reviews each element of each count, identifying only those facts that are relevant, material and necessary to determine a verdict. To the extent the court relies on a witness's testimony without discussion, it has determined that testimony is credible; if testimony is deemed not credible and the lack of credibility is material, the court says so.

    A.    <u>Mr. Memmott's Personal and Professional Background</u>

    1.    <u>Education and Family</u>

1.    Mr. Memmott completed his undergraduate and legal training at Stanford University. TRM[1] 2:25 to 3:8. He was admitted to the California Bar in 1966[2] and at the time of trial remained a member of the Bar. TRM 85:16-24. He worked and then practiced business and tax at a law firm in Willows, California for more than twenty years, from 1964 to 1985; during that time he represented clients in tax matters and IRS audits. TRM 2:25-4:10, 3:22, 79:13-80:4; TRW[3] 215:2-11; Ex. 4 at 68:5-15.

2.    Mr. Memmott and his first wife, Jill Scott (also referred to here as Jill or Jill S. Memmott), married before he attended law school, in 1961. In 1971, they purchased a home in Willows, at 521 S. Culver Street ("S. Culver Property"). TRM 3:9-16, 32:9-13.

3.    Mr. Memmott and Jill raised four children, including two biological sons named Scott and Jonathan, a biological daughter named Melissa and an adopted son named David. TRM 9:23-10:4, 33:23-34:3. Jonathan and Melissa both are disabled from a condition known as myotonic dystrophy; Jonathan is totally disabled and Mr. Memmott is his caretaker. TRM 34:4-12. The Memmotts' son David died on November 10, 1998, of a congenital heart defect. Jill died of breast cancer on November 30, 1998. TRM 9:19-10:11, 33:19-22.

---

[1] TRM refers to the Trial Testimony of Orion Douglas Memmott.

[2] While Mr. Memmott's Proposed Findings provides a year of 1964, that was the year in which Mr. Memmott graduated from law school, not the year he was admitted to the bar. TRM 3:17-20.

[3] TRW refers to the Trial Testimony of Witness Testimony.

4.      Many years later, Mr. Memmott testified that the "only time I've really been stressed a lot was when my wife and my son died." Ex. 4 at 66:24-25.[4]

5.      Mr. Memmott married Shiela Enos on May 18, 2002. Prior to their marriage, Shiela had worked for Mr. Memmott and been a friend to Mr. Memmott's family. TRM 22:1-9; TRW 298:4-300:18. Prior to marrying Mr. Memmott, Shiela had been married to a Lance Boyd; she divorced him at some point between 2000 and 2002.

6.      During the time Mr. Memmott and Shiela were married, he put his money in Shiela's checking account; he did not have his own account. Ex. 4 at 30, 50.

7.      Mr. Memmott filed for divorce from Shiela in Fall 2003, after he learned she was having an affair. TRM 28:15-22; TRW 331:11-13. Mr. Memmott's Petition for Dissolution of Marriage was bifurcated, and his marriage to Shiela was dissolved in Spring 2004, with the issue of division of assets to be determined at a later date. TRM 11:1-22. He and Shiela were formally divorced in December 2005, following acrimonious proceedings, which culminated in a divorce trial and entry of judgment in Glenn County Superior Court. TRM 39:4-17; TRW 256:16-257:2, 280:10-20, 281:16-20; Ex. 6e (discovery responses); Ex. O.

8.      Mr. Memmott later married Donna Jene Harris (also referred to here as Donna or D. Jene Harris or Donna J. Memmott). TRM 121:9-15.

2.      <u>Business Ventures (1985 - Present)</u>

9.      In 1985, Mr. Memmott retired from his law firm. TRM 4:11-13. It was at this point that Shiela began working for him as a secretary. TRW 297:16-25, 298:21-25. Before leaving the firm, Mr. Memmott had participated in the production of successful IMAX motion pictures; following his departure from the firm he has engaged in a variety of business ventures. TRM 4:11-19.

/////

---

[4] Exhibits identified by number are government exhibits; those identified by letter are defendant's.

10. In the 1990s, Mr. Memmott worked with his friend and business associate Kieth Merrill on the IMAX film *Grand Canyon: Hidden Secrets,* for which they received substantial amounts of money. TRM 5:20-6:20; TRW 389:3-14. Until about 1998, they did this work through a company they called World Cinemax Productions, Inc. TRW 524:8-10. World Cinemax, a corporation, also engaged in real estate development and theater operations; Mr. Memmott served as CEO; at one point his brother Roger was Vice President and his son Scott was secretary. Ex. 4 at 14.

11. Following the *Grand Canyon* film, Mr. Memmott and Mr. Merrill made another film on Zion National Park, with a company they called Cinemax. TRW 401:1-3. Their subsequent efforts to establish and maintain a perpetual fund for making movies were not successful. TRM 6:17-21, 8:10-11. The business entities created to establish the perpetual fund were named Whitelight Motion Pictures and Audience Alliance. TRW 389:24-390:5, 394:15-24; Ex. 4 at 23:9-24:1. Mr. Merrill withdrew as a principal in Whitelight Motion Pictures in the early 2000s; although that entity attempted to raise funds for a movie project, it was unable to do so, and ended up embroiled in litigation over the proposed project. Ex. 4 at 19-21. Mr. Memmott testified at deposition during his divorce proceedings that he never received any income from Whitelight. *Id.* at 23.

12. Mr. Memmott established the various corporations and partnerships identified above, as well as other entities for day-trading and real estate activities; he opened and controlled the bank and trading accounts for each of the entities he established. Although an entity might have been formed for one purpose, Mr. Memmott did not necessarily maintain clear lines of separation among and between various entities, including with respect to the deposit and disbursement of funds. TRM 66:19-24; TRW 440:8-441:19, 442:4-443:5, 453:5-18, 502:7-503:1; Exs. 21-25. Funds would be transferred from one company to another in the form of loans, or as investments in projects. Ex. 4 at 57:17-24. In addition to World Cinemax, Cinemax and Whitelight Motion Pictures, Mr. Memmott also formed American Ventures Group ("AVG").

AVG served as a consulting partnership for the other projects.  Mr. Memmott's partners in AVG included his brother Roger and his son Scott.  In 2005, AVG did not have any "current projects." TRM 7:4-8:11, 68:3-69:1; TRW 389:24-390:11, 392:9-394:24, 401:1-5, 438:24-439:1; Ex. 4 at 18-19.

13.     At times, Mr. Memmott would borrow money from one or another of his companies, including World Cinemax.  He testified at deposition during his divorce proceeding that he "usually paid it back."  Ex. 4 at 31.

14.     During the time Shiela worked for Mr. Memmott, from 1985 to 2003, she held signatory authority with respect to certain of Mr. Memmott's bank accounts, including both home and office accounts.  Ex. 4 at 12.

3.     <u>Day Trading</u>

15.     Starting in or about 2002, Mr. Memmott began to engage in the practice of day-trading, in which financial investment instruments, namely stocks, stock options, and futures contracts, are bought and sold within the same trading day on public securities markets.  TRM 37:11-13, 69:16-21.  He estimated he made "maybe a hundred grand" through day trading in 2002.  Ex. 4 at 46:24-47:4.

16.     Mr. Memmott established business entities for the conduct of his day-trading, including Cinemax Interactive Brokers and Trader X.  TRW 493:21-497:8; TRM 121:7-122:5; Exs. 12c, 12e, 12g, 25.  He also used a preexisting company, Pacific Capital Group, for trading on behalf of one investor.  TRM 72:4-17; Ex. 13b.

17.     Between 2004 and August 2005, Mr. Memmott engaged in day-trading using the Cinemax and Trader X brokerage accounts, as well as through Pacific Capital Group.  Ex. 13a; TRW 362:6-18.  He day traded on behalf of four people who testified at trial: Kieth Merrill, Merrill Osmond, Ranelle Wallace and Carrel (Sam) Balderston.  Exs. 21, 22, 23, 24, 25; TRW 359ff, 376ff, 388ff, 403ff.

/////

18. In or about February 2004, Mr. Balderston invested $50,000 on behalf of his family limited partnership with Mr. Memmott. Ex. 13a.

19. Between April 2004 and August 2004, Merrill Osmond deposited $60,000, into the Whitelight Motion Pictures, Inc. Corporate bank account. Ex. 21; TRW 410:14-411:3.

20. Between June 3, 2004 and February 18, 2005, Kieth Merrill deposited $500,000 into the Cinemax account. Between June 2, 2005 and June 21, 2005, Mr. Merrill deposited an additional $150,000 into the account. Ex. 21; TRW 391:20-393:24. In a trading agreement he entered into with one of Mr. Merrill's trusts in June 2004, Mr. Memmott agreed to provide trading services for the "nominal" amount of $500 per month. Ex. 12b. Mr. Merrill and Mr. Memmott entered into a similar agreement in January 2005. Ex. 12; TRM 105:12-106:1.

21. On June 8, 2005, Ranelle Wallace wired $37,000 into the Cinemax account. Ex. 21; TRW 380:6-13, 382:21-383:5.

22. The day-trading business was not successful. Mr. Memmott lost a substantial part of the monies provided by the four individuals. TRW 395:12-396:1; TRM 100:9-23, 102:8-11, 103:17-20, 104:21-24. Of the $50,000 invested by Sam Balderston, Mr. Memmott returned $10,000 in August 2004, calling it a return on investment, in a check drawn on the Whitelight Motion Pictures account. TRW 366:9-17, 367:7-18; Ex. 32a. In fact, the check was backed by funds provided by another investor. TRW 489:14-490:5. Of the total of $747,000 that was invested by Mr. Merrill, Mr. Osmond, and Ms. Wallace, Mr. Memmott returned a little more than $300,000 to these investors prior to September 2005. Ex. 21; Exs. L, M.

23. Mr. Memmott used some of the investors' funds for his own purposes. TRM 65:3-23, 102:20-22, 108:17-19; Ex. 21; Exs. L, M. He considered these funds "loans" that he would pay back, none of which were "income," even though Mr. Merrill's agreement at least, allowed him to be paid $500 a month. TRM 64:14-21, 106:5-25.

24. Specifically, on March 28 and 29, 2005, Mr. Memmott transferred $110,000 out of the Cinemax brokerage account into the Cinemax corporate bank account. Ex. 25; TRW

496:21-497:3.  This represented almost all of the money in the Cinemax brokerage account; after the transfer Mr. Memmott largely ceased use of the Cinemax brokerage account.  TRW 498:23-499:6.  Between March and June 2005, Mr. Memmott spent funds out of the bank account on personal trainers, vitamins, travel and dining out.  TRW 475:2-8, 475:24-476:1, 476:10-11 & 24-25, 477:11-12, 480:8-10; TRM 65:13-16; Exs. 21, 22.

25.  On April 13, 2005, Mr. Memmott transferred $70,000 from the Cinemax corporate bank account to the Trader X brokerage account.  Ex. 25; TRW 497:4-8.  Mr. Memmott then began using the Trader X account in a pattern consistent with his prior use of the Cinemax brokerage account.  TRW 498:19-498:22, 502:7-503:1.

26.  At trial, Mr. Memmott acknowledged that the investor money he spent on personal expenses did not belong to him and that he is obligated to repay Sam Balderston, Kieth Merrill, Merrill Osmond and Ranelle Wallace for the funds not returned to them, regardless of how the funds were lost or expended.  TRM 2:3-13, 64:14-18, 65:3-23; TRW 397:5-17.

27.  He also acknowledged that he had, at various points, provided each investor with documents or information that suggested their investments would perform or were performing well, when they would not or were not.  *See, e.g.*, TRM 89:8-18 (Wallace), 99:19-100:11, 100:21-102:3 (Balderston), 102:12-19, 118:1-10 (Osmond); Ex. 12e (Merrill).

4.  Real Estate Purchases, Sales and Investments (1995-2002)

28.  In addition to the S. Culver Property he purchased with Jill, Mr. Memmott acquired interests in or was involved in the purchase or acquisition of other residential properties in Willows, California.  TRW 446:17-21.  The properties relevant to the court's ultimate conclusions are reviewed below.

a.  S. Culver Property

29.  Mr. Memmott transferred his interest in 521 S. Culver Street to Jill by quitclaim deed, on February 25, 1991.  Exs. 7a, 26; TRW 249:7-13.  The quitclaim deed identifies transfer taxes of zero dollars.  Ex. 7a.

30.    On December 17, 1997, the IRS filed a Notice of Tax Lien against 521 S. Culver Street in connection with Mr. Memmott's and his wife's unpaid individual tax liabilities for the 1993, 1994 and 1995 tax years.  Ex. 1c.  The total indebtedness was $13,889.76, for penalties assessed on June 9, 1997 and June 30, 1997.  *Id.*  This was the first of several tax liens the IRS filed against property it identified as belonging to Mr. Memmott.

31.    On November 19, 1998, just before she died, Jill transferred S. Culver by grant deed to herself and her son Scott D. Memmott as joint tenants.  Ex. 7b.  This transfer was made as part of Jill's estate planning.  TRM 33:15-21; Ex. 4 at 40:13-17.  The grant deed identifies transfer taxes of zero dollars.  Ex. 7b.

32.    On August 21, 2001, by grant deed, Scott D. Memmott transferred S. Culver to himself and his siblings Melissa Anne Rocksvold (neé Memmott) and Jonathan Ladd Memmott as joint tenants.  Ex. 7c.  This grant deed identifies transfer taxes of zero dollars.  *Id*.

33.    On August 14, 2003, by grant deed, Scott D. Memmott, Melissa Anne Rocksvold and Jonathan Ladd Memmott, transferred the property to their grandmother, Mr. Memmott's mother, Nelda P. Memmott.  Ex. 7d.  The grant deed identifies transfer taxes of zero dollars.  *Id*.

34.    On September 30, 2003, by grant deed, Nelda P. Memmott transferred the property to Walter E. Smith and Dorothy L. Smith as joint tenants, in connection with a sale.  Ex. 7e.  The grant deed identifies a transfer tax of $253.  *Id*.  On the same date, North State Title Company provided Nelda with an escrow check made out to her in the amount of $110,622.20.  Ex. 7f.  The escrow check's subject line lists "521 S. Culver Street, Willows, CA 95966," and the back of the check bears the endorsement, "pay to the order of O. Douglas Memmott."  *Id*.  The signature "Nelda P. Memmott" appears below the endorsement.  *Id*.

35.    On October 2, 2003, IRS records show a "subsequent payment" of $11,648.50 credited by virtue of a "federal tax lien," toward Douglas and Jill Memmott's 1994 taxes.  Ex. 1a at 1992.  It is a reasonable factual inference, that prior to making the escrow check payable to

/////

Nelda Memmott, the title company paid funds toward the balance of the Memmott's unpaid 1994 taxes subject to the 1997 IRS lien.

36.     Also on September 30, 2003, the date Nelda transferred ownership of S. Culver and received the escrow check, Mr. Memmott deposited the escrow check into the Cinemax corporate bank account, which he controlled.  TRW 504:22-505:14.

37.     From the Cinemax bank account, Mr. Memmott broke the escrow funds down into separate $55,000 checks, which Mr. Memmott deposited into his Cinemax brokerage account and Whitelight Motion Pictures bank account, respectively.  TRW 506:14-506:22; TRM 37:7-13.

38.     With a portion of the escrow funds in the Whitelight Motion Pictures account, Mr. Memmott wrote checks to the AVG partners, his son Scott Memmott and brother Roger Memmott.  There also was a $15,000 "official bank check" whose recipient is unidentified.  TRW 507:1-20.

39.     Mr. Memmott did not report any activity in connection with the sale of S. Culver on his tax return for 2003, filed in 2004.  *See* Ex. 16; TRM 144:8-19.  He said he did not because he considered the proceeds a gift from his children that was not taxable.  TRM 144:24-146:25.

### b.     Washington Street Property

40.     On or about January 11, 1995, Mr. Memmott signed a Purchase Agreement to buy a house at 1024 Washington Street in Willows ("Washington Street Property").  The Agreement identifies only Mr. Memmott as "the buyer" and only Mr. Memmott signed it. Ex. 5a.  The house was put in the name of Mr. Memmott's mother, Nelda P. Memmott.  *Id*.; TRM 80:18-81:8.

41.     The purchase price consisted of a $100,000 down payment and $120,000 promissory note.  TRM 13:16-13:18; Exs. 5a, 5b.  Nelda Memmott signed the promissory note. Ex. N.  She also signed a Deed of Trust on the Washington Street property securing the note. The note was due and payable within a year.  Ex. 5a; TRW 202:1-3.

/////

42.     World Cinemax Productions, Inc. and the Scott Irrevocable Trust each contributed $50,000 to source the down payment. Ex. 5b. The Scott Trust was one of two trusts set up by Jill's mother and father and the $50,000 from the Trust was with Jill's agreement. TRM 14:15-19. Mr. Memmott signed each $50,000 check. Ex. 5b. The title company receipt for the funds identifies them as received from "Douglas Memmott for Nelda Memmott." *Id.*

43.     On February 23, 1995, by grant deed recorded that date, the seller transferred 1024 Washington Street to Nelda Memmott. Ex. 5d. The deed identifies a documentary transfer tax of $242. *Id.* That same day, February 23, 1995, Nelda Memmott transferred the property by grant deed recorded that date to herself and Mr. Memmott as joint tenants for "valuable consideration." Ex. 5e. No transfer tax was identified. *Id.*

44.     The note payments to the seller were not made in a timely manner, and so the seller's representative made several demands for payment in the form of calls, letters and a foreclosure action. TRW 202:4-7.

45.     Mr. Memmott responded by writing letters that outlined a payment schedule, apologized for the delay, and stated that the "decision not to finance the house has caused delay." Ex. 5c. In the letters, Mr. Memmott reaffirmed that he intended to pay down the note within a specific period of time and requested the going-forward balance. *Id.* In September 1998, a full reconveyance to Nelda Memmott was filed by the seller, suggesting the note was by then paid in full. Ex. 5f.

46.     At some point after purchasing the Washington Property, Nelda Memmott moved from her home in St. George, Utah, into the Washington Property, where she lived until Mr. Memmott's marriage to Shiela on May 18, 2002. TRM 20:1-25, 23:20-23, 24:25-25:5; TRW 314:20-22, 318:3-7.

47.     Between 1999 and 2001, Nelda Memmott repaid a combined total of between $120,000 and $121,000 to AVG and the Scott Irrevocable Trust. Exs. T, U, V, W; TRM 14:23-20:13.

48.     On August 21, 2001, Nelda P. Memmott as Trustor and Mr. Memmott as Trustee jointly filed a Short Form Deed of Trust and Assignment of Rents in favor of Shiela, who at the time was not yet married to Mr. Memmott. Ex. 5g.

49.     On November 5, 2002, after Mr. Memmott and Shiela were married, a Preliminary Change of Ownership Report was filed indicating the property would be transferred from "Memmott" to Shiela Enos Boyd. Ex. 5h. The form indicates the nature of the transfer as a "foreclosure" transfer dated October 17, 2000. *Id.* At trial, Mr. Memmott testified that he helped prepare the form and conceded that there was no foreclosure. TRM 135:7-20. Shiela had signed the Preliminary Change of Ownership Report on October 17, 2000. *Id.*

50.     Also, on November 5, 2002, by grant deed, Mr. Memmott and his mother transferred their interest as "joint tenants" in the property to Shiela. Ex. 5i. The grant deed recorded that day identifies a documentary and city transfer tax of zero dollars. *Id.* Mr. Memmott and Nelda P. Memmott had signed the grant deed on October 17, 2000. *Id.*

51.     At trial, Mr. Memmott testified that before they were married, Shiela wanted assurances that she would have her own house, for financial security, which is why he, his mother and Shiela signed the documents before the marriage, with recordation only after. TRM 23:2-24:24; *see also* TRW 344:8-345:3; Ex. 4 at 35.

52.     On January 7, 2003, Shiela filed a substitution of Trustee and Deed of Full Reconveyance, vesting title in the Washington Property in her. Exs. 5j, 27; TRM 26:20-27:3. On January 23, 2003, Shiela obtained a loan from Bank One on the property, in the approximate amount of $142,000; she provided these funds to Mr. Memmott for use in his business. Ex. 27; TRM 27:4-28:11; TRW 327:25-328:16. On January 28, 2003, Shiela Memmott, formerly Shiela Enos-Boyd, joined by Douglas Memmott, filed a Deed of Trust in favor of Bank One, NA. Ex. 5k. In describing the arrangement with Shiela regarding Washington Street during his deposition for his divorce proceeding, Mr. Memmott testified that it was similar to other arrangements he had had with her: "I'd put other property in her name. And then, when I wanted

to borrow money on it, why, I did with no problem. And we sold it, I got the money with no problem. And she basically told me that she'd deed it back to me any time I'd ask for it." Ex. 4 at 35:9-14, 48:4-49:6. No written agreement memorialized Mr. Memmott's arrangement with Shiela. *Id.* at 64:1-8.

53. On April 7, 2003, a Homestead Declaration for Washington Street, which Shiela Enos Memmott had signed on November 15, 2002, was recorded at Mr. Memmott's request. Ex. 5i.

54. In March 2005, in connection with the opening of his Trader X brokerage account, Mr. Memmott drafted a three-year lease agreement wherein he leased 1024 Washington Street to Trader X, Inc. for $1,200 a month. Ex. 14.

55. On March 29, 2005, the IRS filed a Notice of Tax Lien against 1024 Washington Street for Mr. Memmott's and his deceased wife Jill's unpaid individual tax liabilities for the 1998 tax year. Ex. 1c. The total indebtedness was $1,090.92 for penalties assessed on April 3, 2000. *Id.*; TRW 159:4-14. The IRS refiled the lien on April 8, 2010, against a new address for Mr. Memmott in Oregon. Ex. 1c.

56. Mr. Memmott signed the lease agreement as the "Lessor" and his wife, D. Jene Harris, signed as the President of Trader X, Inc. Ex. 14.

57. During their divorce proceedings in 2005, Mr. Memmott and Shiela each claimed Washington Street as theirs. Mr. Memmott said he had made some of the mortgage payments, and he also had given money to Shiela to make the payments. Ex. 4 at 42:15-23.

58. During his divorce deposition in October 2005, Mr. Memmott testified that the IRS had not threatened to lien any real property he might own, "not yet." Ex. 4 at 78:4-9. He also said he was "sure" the IRS could lien property in Shiela's name in order to collect his taxes. *Id.* at 78:11-23. He also said, however, that he thought the "Washington house is relatively safe as long as it's transferred back to my mother because she bought it and she's the one that paid /////

for it, and I believe the IRS believes that it's her property. If it becomes Shiela's property, I think that the IRS will go after it." *Id.* at 78:18-23.

59.     In the final divorce judgment rendered in December 2005 by the Superior Court of Glenn County, the Washington Street Property was awarded to Mr. Memmott's mother or her nominee. Ex. O at 9.

60.     Shiela never transferred title to the Washington Property to Mr. Memmott's mother. She testified she did not because Mr. Memmott did not pay her $108,000, as also ordered by the Glenn County court. TRW 349:6-350:2; TRM 42:13-18.

61.     After the divorce judgment finalizing his divorce from Shiela, in July 2006, Mr. Memmott negotiated a new lease, in the form of a lease and option to purchase 1024 Washington Street. The lease identified the lessor as "Jan C. Memmott, as Trustee of the Nelda P. Memmott Trust" and the lessee as "Thomas and Ruby Blevins." Ex. 8. Mr. Memmott signed his brother Jan's name to the lease. TRM 84:21-85:6. Jan testified he did not participate in the lease agreement and it is not his signature on the document. TRW 291:3-15.

62.     On January 16, 2007, Mr. Memmott, acting as the attorney for Jan C. Memmott, filed an unlawful detainer lawsuit in Glenn County Superior Court seeking to evict Thomas and Ruby Blevins from 1024 Washington Street. Ex. 9.

63.     In filing the eviction lawsuit, Mr. Memmott knowingly filed the lease and option to purchase agreement, on which he had signed Jan's name, with the Glenn County Superior Court. Ex. 9; TRM 86:3-86:25.

64.     The property ultimately was purchased in a foreclosure sale by an entity owned by Shiela's new husband, Alan Etchepare. TRM 42:20-22; TRW 350:22-351:1.

c.     Rice Ranch Partners

65.     In 1997, Mr. Memmott sold some agricultural property he owned, known as Rice Ranch, for about $1 million. TRM 128:7-10; Ex. 4 at 32-33. In that same year, Mr. Memmott estimated he had approximately $1 million in the bank or "in projects." Ex. 4 at 43:18-20.

66. Tax records for the tax year 1997 reflect only that Mr. Memmott filed an amended return in 1999 and voluntarily paid $1,000. Ex. 1 at 1997.

d. Jefferson Street

67. In 1997, Mr. Memmott loaned funds to Shiela, his secretary at the time. The funds came from AVG and allowed Shiela to purchase a home on Jefferson Street and move out of her prior residence, which had repeatedly flooded. Shiela repaid AVG in 1999 by obtaining a loan on the Jefferson property. TRM 22:10-22, 25:6-8; TRW 335:2-14.

68. Even though Shiela's name was on title, Mr. Memmott had her pay rent because the property was his, "it wasn't hers." Ex. 4 at 44:12-18.

69. When Mr. Memmott and Shiela were married, the Jefferson Street house was sold. TRM 25:3-8, 10-22, 25:6-8, 26:7-8; TRW 345:17-18.

70. At his deposition in connection with his divorce proceeding, Mr. Memmott testified that he was the one who sold the Jefferson Street property; while the title was in Shiela's name, she signed all the required paperwork at his direction. Ex. 4 at 36:8-19. While he did not receive funds directly from the Jefferson Street sale, Shiela did; some funds, in the range of $45,000 to $55,000, went into the Whitelight Motion Pictures account. *Id.* at 36:20-37:7. Mr. Memmott said that Shiela had taken $90,000 out of the Jefferson Street sale proceeds, which he considered a debt she owed him. *Id.* at 63:8-15.

e. W. Sycamore Street

71. In or about July and August 2002, after his marriage to Shiela, Mr. Memmott negotiated to buy a home in Shiela's name from Willows residents Alfredo and Roberta Ycasas. TRW 215:12-216:1. On August 22, 2002, by grant deed, Alfredo and Roberta Ycasas transferred 1252 W. Sycamore Street to Shiela Enos Memmott. Ex. 6a.

72. Shiela made the down payment of $15,000, using proceeds from the sale of the Jefferson Street house, and signed a note with the Ycasases for $60,000. TRM 37:19-38:3.

/////

73.     On August 22, 2002, by grant deed, Alfredo and Roberta Ycasas transferred 1252 W. Sycamore Street to Mr. Memmott's wife, "Shiela Enos-Memmott, a married woman as her separate property." Ex. 6a.  The grant deed identifies a documentary transfer tax of $82.50.  *Id.*  At the same time, Mr. Memmott executed an interspousal transfer grant deed, transferring any interest he had in the property to Shiela.  Ex. 6b.

74.     In the grantor portion of the grant deed, "Douglas Memmott and" is crossed out with slashes.  Ex. 6a.

75.     In the divorce proceedings, Shiela claimed the Sycamore Property was hers, in addition to the Washington Property.  TRW 347:6-18.  During his deposition taken in October 2005 in connection with those proceedings, Mr. Memmott confirmed that he claimed the Sycamore Property as his.  Exs. 1a, 1c, 4 at 64:9-12; TRM 39:4-42:12.  He also agreed that if his name "had been placed on title for West Sycamore, the IRS would have placed liens on it." TRM 138:2-5.

76.     More than once, Mr. Memmott fell behind on payments owed to the Ycasases. TRW 218:8-14.  On at least one occasion, in September 2006, Mr. Memmott responded to Mrs. Ycasas's queries for payment by writing a letter that outlined a proposed payment schedule.  Ex. 6d.  Enclosed with Mr. Memmott's letter were six money orders totaling $5,687.54, which reduced the amount owed on the promissory note to $4,000.  *Id.*

77.     At one point when Mrs. Ycasas visited the property after selling it, Mr. Memmott told her he was remodeling the property into a residential property.  TRW 217:16-218:4; TRM 38:5-7.  Mr. Memmott's disabled children and grandchild did in fact live in the Sycamore Property.  TRM 34:6-25, 35:9-10, 37:19-38:25, 76:6-77:5; TRW 324:5-10.  Between 2003 and 2005 they paid rent of several hundred dollars per month.  Ex. 6e at 1613-1617; Ex. 4 at 8:7-10.  Mr. Memmott testified that the expenses associated with the property exceeded the rental income, which is why he did not report any net rental income on his tax returns for those years.
/////

TRM 46:15-23, 76:9-77:8.  At his 2005 deposition, he said his only income at the time was social security and rent from his children.  Ex. 4 at 51:4-7.  *Cf.* Exs. 16, 17; TRW 46:16-47:13.

78.     Mr. Memmott did report the Sycamore property on his 2003 and 2004 tax returns because he was not sure what Shiela was doing about it; he received the rental income and paid the mortgage.  TRM 54:14-55:7, 77:9-15.  He did not report the property on his 2005 tax return.  TRM 77:16-79:4.

79.     In the final divorce judgment rendered in December 2005 by the Superior Court of Glenn County in Mr. Memmott's divorce from Shiela, the Sycamore Property was awarded to Mr. Memmott's disabled son Jonathan or his nominee.  Ex. O at 9.

80.     Shiela never transferred title to the Sycamore Property to Jonathan.  She testified she did not because Mr. Memmott did not pay her the $108,000 also ordered by the court.  TRW 349:6-350:2; TRM 42:13-18.

81.     Like the Washington Property, the Sycamore Property was foreclosed upon; Shiela transferred title in it to her parents.  TRM 42:23-25; TRW 351:2-5, 349:6-351:5.

5.     Other Information on Financial Condition

82.     Mr. Memmott testified that in 2002 his financial condition was "pretty good."  He had "made a lot of money over the years" and made "maybe a hundred grand that year. . . . It will show on my tax returns." Ex. 4 at 46:24-47:5, 60:1-4, 65:19-23 (tax return will show what earned between May 2002 and September 2003; he thinks "a fair amount").  The transcript for tax year 2002 notes adjusted gross income of $20,592 and taxable income of $13,667.  Ex. 1a at 2004.  The tax return for 2003 shows gross income from consulting of $24,000 and $5,236 adjusted gross income.  Ex. 15 at 65, 68.

83.     At some point, prior to the sale of S. Culver, Mr. Memmott suffered an adverse judgment in a civil case brought against him by an entity called Baskins Creek.  TRM 131:25-132:1.  The judgment was in the amount of between $60,000 and $70,000.  *Id*.; Ex. 4 at 15:22-16:8.

84.     In September 2005, Mr. Memmott received a check for $41,000 from a David Bennion, which was an unexpected referral fee for a case he sent to Bennion.  TRM 118:11-24.  Mr. Memmott did not expect this payment and was surprised when it arrived. TRM 118:11-120:19.  Mr. Memmott deposited the check into his wife Donna's account and used the majority of this money for personal expenses.  TRM 118:11-120:4.  Mr. Memmott reported this income on his 2005 tax return as consulting income.  Ex. 17 at 540.

85.     In October 2005, during his deposition in connection with his divorce proceedings, Mr. Memmott testified that he believed his net worth at the time was approximately $50,000, not including any real property but including personal property and a couple of automobiles.  Ex. 4 at 86:1-7.

B.      IRS Audit and Assessments (1996-2002)

86.     In 1996, the IRS began an audit of the individual tax returns for years 1993 to 1995 of Mr. Memmott and his wife Jill.  The IRS subsequently expanded the audit to include the years 1996 to 1999.  In the course of the audit, the IRS also considered the finances of Mr. Memmott's companies as they related to his personal income.  TRM 6:21-9:15.  The audit continued through 2002.  TRM 9:16-18.

87.     While the audit was being conducted, Mr. Memmott filed income tax returns, all of which were late, for the years 1993 to 1995.  Mr. Memmott voluntarily paid total taxes of approximately $19,000 for the years 1993 to 1995, which constituted some, but not all, of the taxes, penalties, and interest reflected on his late returns or due as a result of the late filing of the returns.  Ex. 1a; TRW 57:1-62:16, 65:13-68:18.

88.     In 1997, the IRS assessed the taxes that were shown as still due on the late tax returns that Mr. Memmott had filed for 1993 to 1995.  "Assessment" is effected by "recording the liability of the taxpayer in the office of the Secretary [of the Internal Revenue Service] in accordance with rules or regulations prescribed by the Secretary."  26 U.S.C. § 6203.  On December 17, 1997, the IRS recorded a lien in the amount of $13,889.76 for the unpaid taxes,

penalties and interest for the tax years 1993 to 1995; the tax lien attached to all property and rights to property of Douglas and Jill Memmott, including the S. Culver property discussed above. Exs. 1a, 1c; TRW 121:23-123:22, 158:13-159:18. Also as noted above, Jill died within a year of this lien being recorded, and well before the audit concluded.

89.     Also while the audit was being conducted, Mr. Memmott filed income tax returns, which were late, for the years 1997 and 1998. There is no record of his having filed a return for 1999. Mr. Memmott voluntarily paid amounts of approximately $1,100 for the years 1996 to 1999, which constituted some, but not all, of the taxes, penalties, and interest reflected on his late returns or due as a result of the late filing of the returns. Ex. 1a.

90.     The IRS made additional assessments and filed additional liens after the audit was concluded, as discussed elsewhere in this order.

91.     At trial, Mr. Memmott testified that he has paid taxes when he has been able, or when he has not had the money he has not paid taxes. He said he does intend to pay all taxes due when he can. TRM 127:12-128:5.

C.     Audit Results and Tax Court Litigation

92.     In 2002, the IRS auditor issued a Revenue Agent's Report, concluding that money that the partnership AVG borrowed from other profitable corporations was income to AVG in the years the loans were made. The IRS auditor thus determined that in the 1990s, Mr. Memmott, his brother Roger, and his son Scott earned substantial taxable income attributable to AVG. The IRS auditor also took the position that AVG had capital losses for its investments in various ventures, which losses could not be used by the partners to offset the substantial income tax liabilities she proposed in her Revenue Agent's Report. TRM 8:12-9:15, 125:10-24.

93.     The IRS auditor proposed an income tax deficiency of over $7,200,000 against Mr. Memmott and Jill Memmott's estate. Mr. Memmott protested the IRS auditor's proposed deficiency to the Appellate Division within the IRS. The IRS Appellate Division reduced the

/////

23

proposed tax deficiency to approximately $1,500,000 and issued a formal deficiency notice in this amount to Mr. Memmott. Ex. 1a; TRM 125:20-126:6.

94.     In 2003, Mr. Memmott filed a petition in the U.S. Tax Court to contest this proposed deficiency. Ex. 1a (transcripts for each tax year, 1993-1996, reflecting legal proceeding filed on May 28, 2003). Mr. Memmott litigated the petition for several years, but testified he reluctantly decided to settle the case because he could not afford to continue litigating. TRM 126:2-9. He testified with conviction that he believed he would ultimately have prevailed if he had been able to continue his case. TRM 126:10-127:6; *see also* Ex. 4 at 56-57.

95.     The tax case for the years 1993 through 1996 was settled in February 2004 and a Tax Court Judgment was entered on May 18, 2004 in the amount of $549,258. As part of the settlement, Mr. Memmott stipulated that the breakdown of his income tax deficiency for 1993 to 1996, excluding interest and penalties, was as follows: 1993 - $316,890; 1994 - $117,741; 1995 - $47,440; 1996 - $67,287. Ex. 1b. The IRS assessed those taxes on September 27, 2004 and filed a tax lien for these taxes on June 23, 2005. Exs. 1a, 1b, & 1c at 2772.

96.     The tax case for the years 1997 through 1999 was settled in September 2005 and Tax Court Judgments were entered on January 26 and April 25, 2006, in the total amount of $107,297. The IRS assessed those taxes on July 10, 2006. Ex. 1a, 1b, 1c; Ex. A.

97.     Based on the foregoing, the court finds that Mr. Memmott did file tax returns, albeit late returns, for tax years 1993 to 1995 and 1997 to 1998; that he paid some small amounts although not the full amount owing toward the taxes he says he computed for those years; that the IRS made assessments and placed liens to collect the amounts it deemed owed, both before and after resolution of Mr. Memmott's tax appeal; and that through his appeal, Mr. Memmott reduced his personal tax liability initially from $7.2 million to $1,500,000, and then again by more than half, from $1,500,000 to $656,555. For these reasons, and in light of Mr. Memmott's testimony that he believed he had a strong case, the court further finds that for the purpose of evaluating below whether the government has met its burden as to the third element of Count

Two – whether Mr. Memmott made affirmative attempts to evade or defeat taxes owed for 1993 to 1999 – it is appropriate to narrow the focus to the question of whether Mr. Memmott made such attempts during the time beginning with entry of the first Tax Court judgment on May 18, 2004, and ending with the last date alleged in the indictment, on or about August 23, 2006. The first May 2004 date corresponds to a time by which Mr. Memmott stipulated, even if unhappily, to a confirmed amount that he owed; second August 2006 date was within several months of entry of the second set of Tax Court judgments.

D.     <u>IRS Tax Collection Efforts (2005-2006)</u>

98.      In May 2005, after the settlement regarding tax years 1993 through 1996, Mr. Memmott's individual tax collection case was referred to IRS Revenue Officer Robert Miller. TRW 101:23-102:10. Officer Miller previously had been involved in efforts to collect business taxes from AVG, the partnership Mr. Memmott had with his brother and son, Roger and Scott. TRW 87:3-10. During that prior collection effort, in April 2005, Mr. Memmott had signed a Collection Information Statement for Business (Form 433-B) for AVG. TRW 88:22-89:1, 90:8-14; Ex. 2. Roger and Scott disclosed their individual financial information and the IRS ultimately closed its cases against them, finding taxes to be uncollectible against them. TRW 101:2-22.

99.      During his workup of Mr. Memmott's individual tax case, and before meeting with Mr. Memmott about that case, Officer Miller put Mr. Memmott's case in "fraud development status," meaning the case reflected "unanswered questions, possibly some suspicious activity." TRW 103:4-18. On June 9, 2005, Mr. Memmott met with Officer Miller to complete a Form 433-A, "Collection Information Statement for Wage Earners and Self-Employed Individuals" in his case. TRW 105:5-21; Ex. X. It is this Form 433-A that is referenced in the allegations supporting Count One of the Superseding Indictment.

100.      Mr. Memmott signed the Form 433-A on June 9, 2005 under penalties of perjury. Ex. 3.

101.    In April 2006, after the settlement regarding tax years 1997 to 1999, Special Agent Shawn Breslin of IRS-CI [Criminal Investigation] and Officer Miller met with Mr. Memmott in Chico, California, to discuss perceived discrepancies in his Form 433-A.  TRW 169:5-15, 515:25-516:10.

102.    At this meeting, Mr. Memmott agreed that he and Shiela had received rent for 1252 W. Sycamore, and had owned 1024 Washington Street.  TRW 518:8-525:18.

103.    When presented with bank records for AVG, Cinemax and Whitelight Motion Pictures, Mr. Memmott also acknowledged diverting to his personal use investor funds intended for day trading.  TRW 524:6-525:18.

104.    On August 23, 2006, Mr. Memmott met again with IRS Agent Breslin.  TRW 526:2-18.  Mr. Memmott at that time said he did not agree he had owned the Washington Street residence.  TRW 527:5-9; *see also* TRM 77:2-8, 78:7-79:4 (waffling at trial on characterization of rents).  He also stated that there was a question as to whether the money he received from investors was in the form of loans, not income.  TRW 527:11-22.

105.    With this relevant background, the court proceeds to address the elements of each charged count.

III.    Analysis and Conclusions of Law

    A.    Count One

        1.    Mr. Memmott made and signed a tax collection document

106.    Mr. Memmott does not dispute that he signed the Form 433-A during his meeting on June 9, 2005 with Officer Miller.  He also does not dispute that he initialed those parts of the form that Officer Miller completed by drawing lines through sections of the form.  While Mr. Memmott does suggest that Officer Miller's involvement in completion of the form undercuts the government's proof beyond a reasonable doubt of this element, the court finds the government has met its burden.  Mr. Memmott, with undergraduate and law degrees from Stanford University and twenty-plus years of prior practice in business and tax law, reasonably

knew he was "making" a tax collection document before he initialed and signed it in front of Officer Miller, even if Mr. Memmott did not make each and every mark on the document. *United States v. Guidry*, 199 F.3d 1150, 1157-58 (10th Cir. 1999) (willfulness inferred in part from accounting background and experience of defendant); *United States v. Diamond*, 788 F.2d 1025, 1030 (4th Cir. 1986) (substantial circumstantial evidence, such as defendant's education and professional experience, supported conclusion that defendant intended to file false returns).

> 2. <u>Mr. Memmott knew the Form 433-A contained materially false information</u>

107.    The second element of Count One is satisfied by two different set of facts, either one sufficient to meet the government's burden on this element.

> a. <u>Washington Street Property</u>

108.    This element is satisfied first by virtue of Mr. Memmott's failure to disclose on the Form 433-A the interest he asserted in 1024 Washington Street in Willows on June 9, 2005. Mr. Memmott did identify Washington Street as his residence on the form, but indicated it was owned by his mother. There is no direct evidence of Mr. Memmott's name on title for the residence. The circumstantial evidence reviewed below, however, supports the conclusion that Mr. Memmott considered himself its de facto owner, or at least an owner, beginning in 1995 through at least June 2005.

109.    It was Mr. Memmott who, in January 1995, entered into a contract to purchase 1024 Washington Street. Exs. 5a and 27; TRW 196:22-200:5; TRM 12:16-13:10, 80:18-81:8. That same month, Mr. Memmott signed the Purchase Agreement to buy the property for $220,000. TRM 80:22-81:8; Ex. 5a (agreement identifying only Mr. Memmott as "the buyer" and signed only by Mr. Memmott). While Mr. Memmott's mother, Nelda P. Memmott, signed the promissory note and a Deed of Trust securing the note held by the sellers, Ex. N, two entities under Mr. Memmott's control, World Cinemax Productions and the Scott Irrevocable Trust, issued separate $50,000 checks to source the down payment, with Mr. Memmott signing each

check.  Ex. 5b.  The title company receipt for the funds identifies them as received from

"Douglas Memmott for Nelda Memmott."  *Id.*

110.   On the same day that ownership was transferred to Nelda Memmott, February 23, 1995, she then transferred the property by grant deed to herself and Mr. Memmott as joint tenants for "valuable consideration."  Ex. 5e.

111.   After note payments were not made in a timely manner, the seller's representative made demands for payment in the form of calls, letters and a foreclosure action.  TRW 202:4-7. It was Mr. Memmott who responded, apologizing for the delay, reaffirming he intended to pay down the note within a specific period of time and requesting the balance due.  Ex. 5c.

112.   After the note was paid off, and the property reconveyed to Nelda Memmott, Nelda repaid between $120,000 and $121,000 to AVG and the Scott Irrevocable Trust.  Exs. T, U, V, W; TRM 14:23-20:13.  But the impression that Nelda, as a result, became or remained the sole owner of the property is belied by subsequent events.

113.   The Preliminary Change of Ownership Report filed on November 5, 2002, indicated the property would be transferred, as a "foreclosure," from "Memmott" to Shiela Enos Boyd.  Ex. 5h.  By grant deed, Mr. Memmott and his mother together transferred their interest as "joint tenants" in the property to Mr. Memmott's new wife Shiela.  Ex. 5i.

114.   In January 2003, after filing a substitution of Trustee and Deed of Full Reconveyance, vesting title in her, Shiela obtained a loan from Bank One on the Washington Street Property, in the approximate amount of $142,000; even though the house was nominally hers, she provided these funds to Mr. Memmott.  Ex. 27; TRM 27:4-28:11; TRW 328:9-16.  On January 28, 2003, Shiela and Mr. Memmott filed a Deed of Trust in favor of Bank One, NA.  Ex. 5k.

115.   In March 2005, after he filed for divorce from Shiela but before the divorce was final, and approximately three months before signing the Form 433-A before Officer Miller, Mr. Memmott drafted the three-year lease agreement wherein he leased 1024 Washington Street

to his new brokerage Trader X, Inc. for $1,200 a month, with his new wife Donna signing as the President of Trader X.

116.    For the foregoing reasons, the government has established beyond a reasonable doubt that when Mr. Memmott signed the Form 433-A on June 9, 2005, he knew it contained false information as to a material matter, by omitting information regarding the interest he asserted in 1024 Washington Street.  Even if Mr. Memmott was not on title for the property on June 9, the government has proved that he qualified as its owner through his "nominee" Shiela Enos Memmott.

117.    The Ninth Circuit recently has clarified the test for evaluating whether someone qualifies as a nominee, in *Fourth Investment LP v. United States*, __ F.3d __, Nos. 11-56997, 11-57009, 2013 WL 2631514 (9th Cir. June 13, 2013).  The test comprises six factors: "(1) whether inadequate or no consideration was paid by the nominees; (2) whether the properties were placed in the nominees' names in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominees and the transferor; (4) failure to record the conveyances; (5) whether the transferor retained possession; and 6) whether the transferor continues to enjoy the benefits of the transferred property." *Id.* at *8-9.  "'Virtually without exception, courts focus on the totality of the circumstances,' and no single factor is dispositive." *Id*. at *9 (quoting *Dalton v. Comm'r of Internal Revenue,* 682 F.3d 149, 158 (1st Cir. 2012)).  "[T]he overarching consideration is 'whether the taxpayer exercised active or substantial control over the property.'" *Id*. (quoting *In re Richards*, 231 B.R. 571, 579 (E.D. Pa. 1999)).  *See also* BLACK'S LAW DICTIONARY (9th ed. 2009) ("nominee" defined, in relevant part, as "[a] party who holds bare legal title for the benefit of others or who receives and distributes funds for the benefit of others").

118.    Here, all of the factors enumerated in *Fourth Investment LP* save one weigh in favor of finding that Shiela was Mr. Memmott's nominee.  Shiela paid nothing for the house; at about the same time title was placed in her name, the IRS audit was concluding and Mr.

Memmott was soon to file an appeal with the Tax Court; Shiela and Mr. Memmott were married, and Nelda P. Memmott was Shiela's new mother-in-law; Mr. Memmott retained joint possession of the house, as Shiela's husband, and alone continuing after their separation; and as a resident of the house, Mr. Memmott continued to enjoy the benefits of the property. The fourth factor is not satisfied, in that Mr. Memmott did record the conveyance to Shiela in November 2002. Although Mr. Memmott's relationship with Shiela had deteriorated by June 2005, the transfer of interest to Shiela that Mr. Memmott had effected through the recording had not been unwound. But his leasing of the property to Trader X in March 2005 is an admission fatal to his defense. And his identification of his mother as the home's owner on the Form 433-A, in light of the lease and his having facilitated the transfer of his joint interest with his mother to Shiela in November 2002, does not withstand scrutiny.

119.    The totality of the circumstances demonstrate Shiela, however estranged, still legally was a nominee. By itself, Mr. Memmott's false reporting with respect to Washington Street is sufficient to satisfy this element of Count One. One other set of facts bolsters the legal conclusion, that the element is proven.

b.      Diverted Investor Funds

120.    Mr. Memmott obtained a total of more than $700,000 from investors in connection with his day trading. Ex. 21.

121.    The day-trading business was not successful. Mr. Memmott lost a substantial part of the monies provided by the investors, and returned only small amounts. TRW 366:9-17, 367:7-18, 395:12-396:1; Exs. 21, 32a.

122.    Mr. Memmott admitted using some of the investor's funds for his own purposes. TRM 65:3-23; Ex. 21; Exs. L, M.

123.    On April 13, 2005, shortly before meeting with Officer Miller regarding his individual taxes, Mr. Memmott transferred $70,000 from the Cinemax bank account to the Trader X brokerage account, Ex. 25; TRW 497:4-8, and began using the Trader X account as he

had the Cinemax brokerage account, for business and personal activities.  TRW 498:19-498:22, 502:7-503:1.

124.    Mr. Memmott acknowledged the investor money he spent on personal expenses did not belong to him and that he is obligated to repay the investors.  TRM 2:3-13, 64:14-18, 65:3-23; TRW 397:5-17.  He also acknowledged providing investors with documents suggesting their investments were performing well, when they were not.  *See, e.g.*, TRM 99:19-100:11, 102:12-19; Ex. 12e (Merrill);  TRM 89:8-18 (Wallace), 100:21-102:3 (Balderston), 118:1-10 (Osmond).

125.    Officer Miller testified that the misappropriated funds, such as those here, should have been disclosed on the Form 433-A. TRW 171:12-25.  If a taxpayer does, unlike Mr. Memmott, disclose information of an illegal nature, such as income received by way of fraud or drug proceeds, a civil revenue officer such as Officer Miller cannot share the information with criminal law enforcement. TRW 180:3-18. The existence of even illegal funds, however, must be disclosed in order to accurately determine the collectability of a taxpayer's debt. TRW 176:25-178:1.

126.    Embezzled funds theoretically can be used to pay a tax debt if they are offered by a taxpayer. TRW 177:19-178:1.  However, Officer Miller testified that he would not accept embezzled funds in payment of a tax debt.  TRW 178:13-179:8, 180:19-25.

127.    Mr. Memmott's position is that the investor funds he diverted from the trading accounts do not qualify as "income" because the money was not rightfully his.  As he testified at trial, the money he owes the investors is a debt he continues to carry.  He asks, rhetorically, if he had not stolen funds from his friends, how much money would the IRS be entitled to?  Officer Miller testified that while the Form 433-A does not expressly state loans must also be disclosed, the IRS's manual does.  TRW 136:1-4. Officer Miller explained that loans are not income for IRS 1040 purposes, but they are for collectability.  TRW 135:4-7.

/////

128.     It is settled law that profits or gains realized illegally qualify as taxable income for the year in which they were obtained.  *See James v. United States*, 366 U.S. 213, 219-20 (1961) ("gain 'constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it'" (citation omitted); while "wrongful appropriations" fall within the "broad sweep of 'gross income,'" loans do not); *see also Hobson v. Comm'r of Internal Revenue*, T.C. Memo 1992-312, 1992 WL 116027 (U.S. Tax Ct. Jun. 2, 1992).  As a lawyer with prior experience in the field of tax, Mr. Memmott can be presumed to understand such essential principles.  *Guidry*, 199 F.3d at 1157-58; *Diamond*, 788 F.2d at 1030.

129.     Here, Mr. Memmott misappropriated the investor funds in the same year they were received, paying only portions back, and personally realized the economic value of the misappropriated funds by expending them on personal matters, including discretionary expenses such as personal trainers and travel.  Mr. Memmott's stated plan to repay the funds does not relieve him of the obligation to have disclosed the funds on the Form 433-A he completed on June 9, 2005; that form made clear that the request for information on income applied to gross monthly income over the course of a tax year.  *See* Ex. 3 (Section 9); s*ee also Hobson*, 1992 WL 116027 ("A reasonable and ordinarily prudent person who had such funds under his dominion and control and who was able to use such funds for his own purposes would have questioned whether such funds constituted income.").

130.     The facts regarding diverted investor funds also establish the second element of Count One.

      3.     The Form 433-A contained a written declaration subject to penalties of perjury

131.     This element is not disputed.  On its face, Form 433-A contains a form of declaration indicating that the signator is signing under penalties of perjury.  On the Form 433-A

/////

he signed, Mr. Memmott's signature appears directly below this express language. Ex. 3 (page 6 of 6).

### 4. In filing the Form 433-A, Mr. Memmott acted willfully

132. By completing the Form 433-A in Officer Miller's presence and then acceding to Officer Miller's accepting the form, Mr. Memmott "filed" the document, a point that is not seriously disputed. *See* 26 C.F.R. § 301.6091-1 (documents hand carried to an authorized IRS official are considered "filed").

133. "Willfulness" for the purpose of this element "requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Cheek v. United States*, 498 U.S. 192, 201 (1991). Given that Mr. Memmott contends he acted in good faith in completing and filing the Form, "[t]he government's burden of proving willfulness requires negating [ ] defendant's claim . . . that because of a misunderstanding of the law, he had a good-faith belief that he was not violating any of the provisions of the tax laws." *United States v. Trevino*, 419 F.3d 896, 901 (9th Cir. 2005) (citation and internal quotations omitted). In order to rely on a good faith defense, the defendant "must in fact have some 'belief;' either that [his] own understanding was correct, or that [he] in good faith relied on the tax advice of a qualified tax professional." *Id.* (citing *United States v. Bishop*, 291 F.3d 1100, 1106-07 (9th Cir. 2002)). Evidence of "willfulness" is "usually circumstantial as direct proof is rarely available." *United States v. Bishop III*, 264 F.3d 535, 550 (5th Cir. 2001) (citation omitted).

134. Here, once he agreed to complete the Form 433-A and file it with Officer Miller, Mr. Memmott was under an obligation to file it accurately. The form itself put him on notice of the duty to provide accurate information, subject to penalties of perjury. Mr. Memmott voluntarily provided information to Officer Miller on June 9, 2005. Although he has intimated that Officer Miller's annotation of the form undercut his responsibility for the filed form's contents, any such argument is not sustainable as discussed above. The primary question with

respect to this element, then, is whether Mr. Memmott intentionally violated his duty to file a fully accurate Form 433-A. For the same reasons discussed with respect to the second element above, the court finds Mr. Memmott's filing of the false Form 433-A was willful: the government has offered competent evidence that establishes beyond a reasonable doubt, by reasonable inference, that Mr. Memmott knew the form omitted materially responsive information regarding his real property interests and his income. Mr. Memmott's claim of believing in good faith that he was not violating any provisions of the tax laws is not credible. As there is no evidence that Mr. Memmott relied on the advice of another professional, his actual belief in the correctness of his understanding is required. It is simply not plausible that someone with Mr. Memmott's level of education, legal training and experience, and business experience, could believe either that he had no reportable property interest in a house claimed as his in a recent lease and in his contested divorce proceeding; or that he had no reportable income for the time covered by the Form 433-A, despite his freely admitting he embezzled funds that he spent on personal expenses and had not repaid in the same year diverted. The government has established this fourth element of Count One as well.

B.    Count Two

1.    Mr. Memmott owed more tax for 1993-1999 than he declared due

135.    Mr. Memmott agrees that he owed approximately $655,655 more for his personal federal income taxes for calendar and tax years 1993 to 1999 than he declared due on his tax returns for those years. *See* Stipulation filed Oct. 21, 2012, ECF 90 ¶ 4.

2.    Mr. Memmott knew more tax was owed than was declared

136.    From 1993 to 1998, Mr. Memmott filed his income tax returns from 8 months to 3 years late, even after obtaining extensions and making modest payments on the date taxes originally were due. For tax years 1993 to 1995, before Mr. Memmott filed any return, the IRS filed substituted returns; substituted returns are returns prepared by the IRS based on its own knowledge or other information it can obtain. 26 U.S.C. § 6020(h)(1); *see In re Hatton,* 220

34

F.3d 1057, 1059 (9th Cir. 2000). In 1996, the IRS filed a substituted return two months after an amended return was filed. Ex. 1a. In 1999, Mr. Memmott did not file any return and the only return filed was a substituted return. *Id.* A summary of relevant, material information for each tax year covered by Count Two is shown below:

| Tax Year | April 15 of Following Year | Subsequent Actions (Returns and Voluntary Payments)[5] |
|---|---|---|
| 1993 | Extension to 8/94 requested; $2,000 paid 4/94 | IRS filed substituted return in 11/96; amended return filed 3/97; $3,015 paid in 2000 |
| 1994 | Extension to 8/95 requested; $100 paid | IRS filed substituted return in 11/96; amended return filed 6/97, when $6,824 "miscellaneous" payment made |
| 1995 | Extension to 8/96 requested; $100 paid | IRS filed substituted return in 11/96; amended return filed 6/97, when $7,063 "miscellaneous" payment made |
| 1996 | Extension to 8/97 requested; $100 paid | Amended return filed 8/98 |
| 1997 | Extension to 8/98 requested; $1,000 paid | Amended return filed 5/99 |
| 1998 | Extension to 8/99 requested; $25 paid | Return filed 4/00 |
| 1999 | Extension to 8/00 requested | IRS filed substituted return in 9/02 |

Exs. 1a, 1c.[6]

---

[5] Amounts shown as paid include only those amounts that are not associated with a notation of "levy" or "lien" or other indication of involuntary assessment on the Transcript for a given year. Ex. 1a.

[6] Exhibit 1a, cited throughout this order, comprises IRS Transcripts for the Tax Years including 1993 to 1999, which the parties stipulate are authentic and admissible. *See* Stipulation filed Oct. 21, 2012, ECF 90 ¶ 3. Exhibit 1c comprises Notices of Federal Tax Liens, also covered by the stipulation. *Id.*

137.    Because neither party has introduced the actual returns for 1993 to 1999, whether substituted or amended or otherwise, the court is not able to determine what Mr. Memmott ever declared he owed, to the extent he did file a return showing he owed more than he paid. However, given that only a substituted return was filed by the IRS for tax year 1999, and Mr. Memmott testified that he was engaged in business endeavors during the time frame including that year, the court infers that he should have filed a tax return for that year; the complete absence of a return supports the negative inference that he knew he owed taxes for that year that he did not declare. *United States v. Khanu*, 662 F.3d 1226, 1230 (D.C. Cir. 2011) (government can prove the existence of a deficiency by indirect methods).

138.    Mr. Memmott's failure to file a return and declare any taxes owing for 1999 is sufficient to establish that Mr. Memmott knew he owed more in taxes than he declared for the relevant time period. *United States v. Stierhoff*, 549 F.3d 19, 26-27 (1st. Cir. 2008) (circumstantial evidence sufficient to prove willfulness).

139.    For the reasons discussed above, the second element of Count Two is satisfied. *United States v. Serrano-Lopez*, 366 F.3d 268, 635-36 (8th Cir. 2004); *see also United States v. Khedr*, 343 F.3d 96, 106 (2d Cir. 2003) (knowledge rarely proven by direct evidence).

### 3.    Mr. Memmott made an affirmative attempt to evade or defeat such tax

140.    As noted above, *see* ¶ 97 *supra*, in evaluating this element, the court focuses initially on the question of whether Mr. Memmott made affirmative attempts to evade or defeat taxes he owed beginning from the date of entry of the first Tax Court judgment on May 18, 2004, at which time Mr. Memmott agreed to an amount owing, and ending with the last date alleged in the indictment, on or about August 23, 2006, close in time to entry of the second set of Tax Court judgments in January and April 2006.  Affirmative attempts must be those "the likely effect of which would be to mislead or to conceal." *Spies v. United States*, 317 U.S. 492, 499 (1943).  "[A] broad range of acts may satisfy this requirement." *United States v. Carlson*, 235 F.3d 466, 469 (9th Cir. 2000) (citing *Edwards v. United States*, 375 F.2d 862, 866 (9th Cir.

1967)).  Such acts can include withdrawing large amounts of cash from business accounts,

*Carlson*, 235 F.3d at 469, "handling [ ] one's affairs to avoid making the records usual in

transactions of the kind," *Spies*, 317 U.S. at 499, and "any conduct, the likely effect of which

would be to mislead or to conceal." *Id*.

141.    As the court has found above, Mr. Memmott falsely understated his income and

assets by omitting material information from the Form 433-A he signed before Officer Miller on

June 9, 2005.

142.    By December 2005, Mr. Memmott had received the judgment in his divorce case

against Shiela.  In that judgment his mother, or her nominee, was awarded the Washington Street

house, for which Shiela remained on title; the court has determined above that Shiela qualified as

Mr. Memmott's nominee for this property.  Although Mr. Memmott never paid Shiela the sum

required under the divorce agreement, and Shiela never transferred title to Washington Street

back to his mother, the court infers that the parties' ultimate failure to comply with the divorce

judgment was not a settled fact until some time after the divorce judgment was entered.  Thus it

was in July 2006, under the circumstances just described and after Agent Breslin had met with

him in April, that Mr. Memmott negotiated a lease of 1024 Washington Street by his brother,

"Jan C. Memmott, as Trustee of the Nelda P. Memmott Trust," to Thomas and Ruby Blevins.

Ex. 8.  But his brother did not know about it and Mr. Memmott admitted signing Jan's name to

the lease.  TRM 84:21-85:6.  The court finds that by taking these affirmative actions with respect

to the Washington Street property, Mr. Memmott facilitated his retaining possession and

continuing to enjoy the benefits of the property, including the ability to collect rents.  *See Fourth*

*Inv. LP*, 2013 WL 2631514, at *8-9; *United States v. Wroblewski*, No. 07cv81 BTW (WMc),

2009 WL 166705, at *4 (S.D. Cal. Jan. 16, 2009) ("The proper inquiry is whether [defendant]

engaged in actions designed to defeat the collection of taxes owed . . . .).

143.    Mr. Memmott's expenditure from various business accounts of more than

$200,000 on personal expenses and expenses for friends and family members, between April 30,

2004 and August 31, 2005, also had the effect of preventing the IRS's detection of funds at his disposal, and consideration of whether those funds could be used for collection purposes. Ex. 21; TRW 469:11-480:14, 541:22-542:18.

144. Mr. Memmott's withdrawal of money from various accounts in the form of cash, including more than $50,000 in ATM withdrawals and checks to cash between April 30, 2004, and August 31, 2005 had the same effect. Ex. 21.

145. The third element of Count Two is satisfied by Mr. Memmott's affirmative acts during the 2004 to 2006 time period.

### 4. In attempting to evade or defeat taxes, Mr. Memmott acted willfully

146. In order to prove that Mr. Memmott acted "willfully" as required by this charge, the government must prove beyond a reasonable doubt that Mr. Memmott knew federal tax law imposed a duty on him, and Mr. Memmott intentionally and voluntarily violated that duty. *Cheek*, 498 U.S. at 201. "In other words," as relevant here, "if you know that you owe taxes and you do not pay them, you have acted willfully." *United States v. Easterday*, 564 F.3d 1004, 1006 (9th Cir. 2009). "[W]illfulness does not require the government to prove that a defendant had the ability to meet his tax obligations." *Id.* at 1011. Some of the case law effectively merges willfulness with the affirmative acts required to establish the third element of Count Two, discussed above. *Spies*, 317 U.S. at 499 ("[W]e would think affirmative willful attempt may be inferred from conduct such as [enumerating examples] . . ."); *see also Bishop III*, 264 F.3d at 550 ("A wide range of conduct can support a finding of willful attempt to evade taxation. . ."). As with the third element of Count One in this case, willfulness can be inferred. *Bishop III*, 264 F.3d at 550.

147. The court finds the evidence shows beyond a reasonable doubt that Mr. Memmott has acted willfully with respect to attempting to evade payment of taxes for 1993 to 1999, at least since 2004. Mr. Memmott does not dispute that he has a duty to pay the taxes he owes based on his settlements with the Tax Court; he says he plans to pay them when he can. But

even if he has not been in a position to pay the full amount due, his actions as discussed under the third element above demonstrate his intentional and voluntary violation of his duty to pay. In addition, his inconsistent statements to Officer Miller and Agent Breslin regarding the Washington Street rents and the diverted investor funds, TRW 518:8-525:18, 526:2-527:22, bolster this finding of willfulness.

IV.     Judgment

For the reasons discussed above, the court enters a judgment of conviction on both counts, and adjudges Mr. Memmott guilty of Count One, violation of 26 U.S.C. § 7206(1) by Subscribing to a False Tax Document, and of Count Two, violation of 26 U.S.C. § 7201, Attempted Evasion of Payment of Tax.

IT IS SO ORDERED.

DATED:   August 21, 2013.

_____
UNITED STATES DISTRICT JUDGE